**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FLETCHER CARSON,<br><br>       Plaintiff,<br><br>vs.<br><br>WALSH GRIFFIN, et al.,<br><br>       Defendants. | Case No.: 13-cv-0520 KAW<br><br>REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AND ORDER REASSIGNING CASE |

Before the court is plaintiff's motion for default judgment. The court held a hearing on the motion on September 5, 2013. For the reasons set forth below, the court recommends that the motion be granted in part and denied in part.

In addition, as the defendants have not appeared in this action and thus have not consented to magistrate judge jurisdiction under 28 U.S.C. section 636(c), this matter should be reassigned to a district judge.

**I.    BACKGROUND**

**A.    Factual background**

During the hearing, on the motion, Fletcher Carson ("Plaintiff") described the events giving rise to this action as follows. Plaintiff, who is a software engineer by trade, was building a new company, EDSI, from the ground-up. He needed funding for this new business venture. In the course of seeking out such funding, Plaintiff contacted Beryl Wolk, a "very well-known worldwide marketing guy" who "helps people all over the world with home-based businesses." Plaintiff has never met Wolk personally, but Plaintiff describes Wolk as "googleable." At some point, Wolk

communicated with Plaintiff and informed him that the type of business venture Plaintiff was pursuing "was not the kind of thing that he did." However, Wolk apparently assisted Plaintiff by circulating Plaintiff's business proposal to the financial contacts Wolk "deals with." As a result of Wolk's efforts, Plaintiff received responses from various individuals offering to help him present his business proposal to venture capitalists for a fee.

It was through this process that Ivan Ahmed Azziz ("Ivan") first contacted Plaintiff in May 2012. Ivan "is a broker located in Dubai," who was acting on behalf of "one of his clients in Riyadh." (Compl. ¶ 21.) This client was willing to extend Plaintiff a $2M business loan. *(Id.)* From May 2012 to December 2012, Plaintiff "work[ed] with Ivan to get over various obstacles which [were] confounding the delivery of the loan proceeds . . . ." (*Id.* ¶ 22.) Ivan eventually communicated to Plaintiff that he was experiencing difficulties closing the deal on his client's end, but that he could put Plaintiff in contact with Walsh Griffin ("Walsh"), to whom Ivan had referred business in the past. Ivan informed Plaintiff that Walsh had agreed to facilitate the funding and disbursement of a $2 million business loan until Ivan was able to resolve the issues he was encountering. Ivan introduced Plaintiff to Walsh via email. (Compl. at 2.) Walsh and "his company Walsh Capital Group show a location in Dublin, Ireland." (*Id.* at 1.)

On December 19, 2012, Walsh emailed Ivan, copying Plaintiff, asking "him to get the agreement to provide up to $500,000 to [Plaintiff] for signature, and to call the consultant immediately to arrange a meeting for [Plaintiff] to pick up funds, with no upfront fees." (Compl. ¶ 23.) On December 20, 2012, Walsh emailed Plaintiff, this time copying Priscilla Ellis ("Priscilla"). Priscilla is an executive of both KVP International Consultants (also known as KVP International Trades) and Vicken International Traders LLC.[1] (*Id.* ¶ 24.) In that message, Walsh explained "that Ivan pleaded for him to step in on the deal to assist in funding." *(Id.)* Walsh indicated that he would have his consultancy firm meet with Plaintiff, give him a check for $3 million, in return for which Plaintiff would write a $1.3 million check and forward $100,000 to Ivan to put an insurance policy in place to cover the loan. (*Id.* ¶ 24.) Walsh emailed Plaintiff and instructed him to call

---

[1] KVP International Consultants (also known as KVP International Trades) have "an address in Texas" and Vicken International Traders LLC is "in New York." Compl. at 1.

2

Priscilla, who would facilitate the transaction.  (*Id.* ¶ 25.)  Walsh provided Plaintiff with Priscilla's contact information. *(Id.)*  Walsh informed Plaintiff that Priscilla would give Plaintiff a $1.5 million check originally issued to some other third party with whom they had arranged a business transaction that was no longer going forward. *(Id.)*  Walsh stated that Priscilla would fly to San Francisco and accompany Plaintiff to the bank to deposit the $1.5 million check, and that he would then complete the "investment so that [Plaintiff] would have the original $ 2 million that Ivan requested of [him]."  (*Id.* ¶ 26.)

Plaintiff called Priscilla to confirm the arrangements.  (*Id.* ¶ 27.)  Plaintiff received an email from Victoria Ellis ("Victoria") with an image of the check.  *(Id.)*  The named payee was Dominican Oil & Gas Exploration LLC.  (*Id.*, Ex. I.)  Plaintiff explained to Priscilla that he could not deposit the check as issued.  (*Id.* ¶ 28.)  Priscilla responded that "she was trying to have Walsh overnight the funds to her office." *(Id.)*

On December 27, 2012, Priscilla left a message on Plaintiff's phone, indicating that Walsh wanted to speak with Plaintiff.  (*Id.* ¶ 29.)  Plaintiff returned Priscilla's phone call.  *(Id.)*  During that call, Priscilla stated that she had received "the check and asked [Plaintiff] how long it would take the bank to clear it, to which [Plaintiff] confirmed the bank's response of . . . 24 hours if they had a bank officer to talk to." *(Id.)*

On December 31, 2012, Walsh explained that the "end of year [wa]s making things difficult and he c[ould] not reach Priscilla."  (*Id.* ¶ 30.)  Walsh explained that he would try a couple of alternatives in an attempt to disburse the loan funds to Plaintiff. (Compl. at 8, 9.)  According to Plaintiff, these alternatives, one of which was to transfer money on to a credit card tens of thousands of dollars at a time, "didn't come to fruition."

On January 5, 2013,[2] Walsh informed Plaintiff that he would transfer the $2 million loan funds onto a line of credit. (Compl. ¶ 42.)  To ensure the processing of these funds transfers, Plaintiff enlisted the help of a friend, John Lindenmeyer.  (*Id.* ¶¶ 46, 63.)  Lindenmeyer had a $1 million equity line of credit, which was large enough to facilitate the funds transfers.  Ivan sent

---

[2] At this time, Plaintiff apparently questioned whether Ivan and Walsh were the same person.  Compl. at 9, 10.

emails and texts instructing Plaintiff to "look at his emails" regarding the disbursement of funds. (Compl. ¶ 40.) Walsh instructed Plaintiff to call Priscilla to "work out the details[.]" (*Id.* ¶ 41.)

Instead of transmitting funds via wire transfer, Walsh deposited a check for $251,072.12 into Lindenmeyer's equity line of credit account. (Pl.'s Br. at 1, Exs. A1-A3, Dkt. No. 22.) Lindenmeyer is the named payee on the check. In an email dated January 8, 2013, Walsh confirmed that approximately $251,000 had been transferred to Lindenmeyer's account. (*Id.*, Ex. A3.) In subsequent emails, Walsh informed Plaintiff that once Lindenmeyer withdrew the $251,000 from his account and Plaintiff wired $127,000 to "Priscilla's KVP Company Account[,]" Walsh would immediately initiate another transfer of $500,000, after which Priscilla would be flying out to Plaintiff with any loan funds yet to be disbursed. *(Id.)* Walsh also indicated that certain "consultants" and "brokers" were owed a 2% commission based on the amount of the total transaction. (*Id.*; Compl., Ex. J.) Plaintiff signed a written fee agreement which named KVP International and Ivan as the intended recipients of that commission. (Compl., Ex. J.)

During the hearing, Plaintiff explained that he and Lindenmeyer visited a local branch of Lindenmeyer's bank and spoke with the branch manager to confirm the status of the $251,072.12 deposit. The branch manager indicated that she did not anticipate any problems with the transaction and that if any issues did arise, they would be known by the next morning. On January 10, 2013, Lindenmeyer gave Plaintiff a cashier's check for $245,622.00, "the total amount of the deposit to [Lindenmeyer's] account less some expenses." (Pl.'s Br. at 1, Ex. B.)

Plaintiff deposited the cashier's check into his own corporate account. (*Id.*, Ex. C.) Plaintiff initiated two funds transfers on January 11, 2013. First, Plaintiff wired $127,000 to Vicken International Traders LLC,[3] on the instructions of Walsh and Ivan, which were communicated to Plaintiff through Priscilla. (*Id.*, Ex. D2.) Plaintiff expected that $127,000 would be used as collateral for the next disbursement of loan funds in the amount of $500,000, which is

---

[3] Although Walsh instructed Plaintiff to deposit the $127,000 into Priscilla's "KVP Company Account," the record indicates Plaintiff deposited that amount into an account held by Vicken International Traders LLC, which is apparently another one of Priscilla's companies. Pl.'s Br., Exs. A3, D1. Plaintiff offers no explanation for this discrepancy.

what Walsh had indicated to him. (*Id.* at 2.) Second, and per Walsh's instructions, Plaintiff wired $33,000 to AJR International FZE[4] in Dubai so that insurance would be put in place to cover the transaction.[5] (*Id.* ¶ 68; Pl.'s Br., Exs. E1-E3.) On January 14, 2013, and this time acting on Ivan's instructions, Plaintiff wired $10,000 to an account of Daniel Okwudili, Ivan's attorney; $3,144.99 to Cisse Abdoulaye; and $3,144.99 to Ben Aka.[6] (*Id.*, Exs. F1-F3, G1-G2, H1-H2; Compl. ¶¶ 55, 56, 60.)

On January 18, 2013, Plaintiff informed Walsh that the original deposit of $251,072.12 had been "recalled/reversed." (Compl. ¶ 63.) Walsh indicated that "his CFO was responsible for the return of the deposited check for $251K because there was no [i]nsurance carried out within 72 hours of the first funding . . . ." (*Id.* ¶ 67.) After Plaintiff wired the $33,000 to cover the insurance costs, Walsh stated that "funding w[ould] be completed." (Compl. ¶ 69.)

During the hearing on the motion, Plaintiff confirmed that he has never met any of the individual defendants. He only communicated with them by phone, through email, and via text message. After transferring $176,289.98 to these individuals and their respective entities, Plaintiff still had not received the $251,072.12 that had been originally deposited into Lindenmeyer's account but subsequently recalled. (Compl. at 27.) Plaintiff tried to resolve the issue with Walsh and Priscilla, to no avail. *(Id.)* Plaintiff has not received the promised $2 million dollar loan proceeds nor the amounts he transmitted to various individuals and entities on Walsh's instructions. *(Id.)*

//

//

---

[4] AJR International FZE "is an insurance company doing business in and having an address in Dubai U.A.E." Compl. ¶ 9.

[5] Plaintiff subsequently initiated a recall of the $33,000 wire transfer, it is unclear whether Plaintiff ultimately cancelled the recall as Walsh requested, or whether the recall was process and the $33,000 returned to Plaintiff. Compl. ¶ 84.

[6] The $3,144.99 figure differs from the $3,000 figure alleged in the complaint. *See* Compl. ¶¶ 56, 103. The additional $144.99 reflects the fees Plaintiff paid to effect the wire transfers. *See* Pl.'s Br., Exs. G1, H1.

**B.     Procedural background**

        1.     The complaint

On February 6, 2013, Plaintiff, who is proceeding *pro se*, filed his complaint against sixteen defendants,[7] alleging violations of 18 U.S.C. § 1343 (fraud by wire, radio, or television); 18 U.S.C. § 371 (conspiracy to commit offense or to defraud United States); and 18 U.S.C. §§ 1961-1968 (Racketeering Influenced and Corrupt Organizations ("RICO") Act). (Compl. at 17, 18 19, Dkt. No. 1.)  In his complaint, Plaintiff also asserts several state law claims, including: check fraud, unjust enrichment,[8] and conversion. (*Id.* at 20, 21.) In his prayer for relief, Plaintiff seeks $251,072.12 in compensatory damages, $753,216.36 in punitive and exemplary damages under RICO,[9] and any interest that the court deems applicable. (*Id.* at 27.) Plaintiff also seeks to hold the individual defendants personally liable for their conduct. (*Id.* at 22, 23, 24.)

Defendants Victoria Ellis and AJR International FZE were dismissed on April 16, 2013. (April 16, 2013 Order Denying Pl.'s Mot. Alternate Service, Dkt. No. 9.) Defendants Ivan Ahmed Azziz, Kelvin Don, Walsh, Walsh Capital Group, Priscilla Ellis, Vicken International Traders LLC, KVP International Consultants (aka KVP International Trades) have been deemed served. (May 31, 2013 Order Granting in Part 2d Mot. Alternate Service at 7, Dkt. No. 14; June 28, 2013 Order Granting in Part 3d Mot. Alternate Service at 3, Dkt. No. 16.)

On July 9, 2013, the Clerk entered default against Walsh Griffin, Walsh Capital Group, Kelvin Don,[10] Priscilla Ellis, KVP International Consultants (aka KVP International Trades),

---

[7] The sixteen defendants are Walsh Griffin, Walsh Capital Group, AJR International FZE, Kelvin Don, Salvatore Financial Agency, Priscilla Ellis, John Kagose, Kenietta Johnson, KVP International Consultants, KVP International Trades, Victoria Ellis, Vicken International Traders LLC, Ivan Ahmed Azziz, Daniel Okwudili Nwankwo, Cisse Abdoulaye, and Ben Aka. Compl. at 1, 2.

[8] The court construes this claim as one for restitution based on a theory of unjust enrichment.

[9] The court presumes that by "punitive and exemplary damages under RICO[,]" Plaintiff refers to the provision authorizing recovery of treble damages. This reading is consistent with Plaintiff's allegation that the conduct complained of "justif[ies] the awarding of treble exemplary and punitive damages . . . ." *See* Compl. at 27.

[10] In his supplemental briefing, Plaintiff states the following: "As it turns out, Kelvin Don, although properly noticed, did not participate in the transfers related to the bounced check, but was part of the

Vicken International Traders LLC, and Ivan Azziz. (Entry of Default, Dkt. No. 18.) On July 14, 2013, Plaintiff moved for a default judgment against all named defendants. (Pl.'s Mot. for Default J., Dkt. No. 19.) The court held a hearing on the motion on September 5, 2013. (Dkt. No. 20.) Plaintiff submitted supplemental briefing on the issue of damages on September 13, 2013. (Pl.'s Br., Dkt. No. 22.) In the supplemental briefing, Plaintiff also seeks to recover the $350 fee for filing this action, even though he "wavie[d] any award of costs" in his motion for default judgment. (*Id.* at 4; Mot. Default J. at 4.)

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) permits a court to enter a final judgment in a case following a defendant's default. *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 999 (N.D. Cal. 2001). The decision to enter a default judgment lies within the court's discretion. *Id.* at 999 (citing *Draper v. Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986) (further citations omitted)); *see also Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

Before assessing the merits of a motion for default judgment, a court must confirm that it has subject matter jurisdiction over the case and personal jurisdiction over the defendants. *See Tuli v. Republic of Iraq (In re Tuli)*, 172 F.3d 707, 712 (9th Cir. 1999). If the court finds these elements satisfied, it turns to the following factors ("the *Eitel* factors") to determine whether it should enter a default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action[,] (5) the possibility of a dispute concerning material facts[,] (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decision on the merits.

*Eitel*, 782 F.2d at 1471-72 (citation omitted). In this analysis, "the well-pleaded allegations of the complaint relating to the defendant's liability are taken as true." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002) (citing *Televideo Sys., Inc. Heidenthal*, 826 F.2d 915,

---

group when the first attempt was to transfer money to a credit card but that did not happen." Pl.'s Br. at 3.

917-18 (9th Cir. 1987)).  Nevertheless, default does not compensate for essential facts not within the pleadings and those legally insufficient to prove a claim.  *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992) *superseded by statute on other grounds*, Pub. L. No. 100-702, 102 Stat. 4669.

### III.   DISCUSSION

#### A.   Subject matter jurisdiction and personal jurisdiction

In his complaint, Plaintiff alleges violations of federal statutes, including the RICO Act, 18 U.S.C. sections 1961-1968.  This court thus has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331(a).  This court has supplemental jurisdiction to decide related state law claims under 28 U.S.C. section 1367.

Defendants Walsh Griffin, Walsh Capital Group, Kelvin Don, Priscilla Ellis, and KVP International Consultants (aka KVP International Trades), Vicken International Traders LLC, and Ivan Azziz have been deemed served.  This court thus has personal jurisdiction over these defendants.  *See* FED. R. CIV. P. 4.

#### B.   The *Eitel* factors

##### 1.   The possibility of prejudice to Plaintiff

Under the first *Eitel* factor, the court considers the possibility of prejudice to a plaintiff if default judgment is not entered against a defendant.  *Eitel*, 782 F.2d at 1471.  Here, Plaintiff would likely have no other recourse for recovery if the court denies his motion for default judgment.  *See PepsiCo*, 238 F. Supp. 2d at 1177 ("If Plaintiff's motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery.").  For this reason, a decision not to enter a default judgment in this case would prejudice Plaintiff.  The first *Eitel* factor thus weighs in favor of the entry of default judgment.

##### 2.   The merits of Plaintiff's claims and the sufficiency of the complaint

The second and third *Eitel* factors concern the merits of a plaintiff's claims and the sufficiency of the allegations in the complaint.  *Eitel*, 782 F.2d at 1471.  In analyzing these two

factors, the court accepts as true all well-pleaded allegations in the complaint. *Televideo,* 826 F.3d at 917-18 (citations omitted).

### *i.   Claims based on federal law*

The claims Plaintiff asserts on the basis of federal criminal statutes fail. 18 U.S.C. section 1343 (wire fraud) and 18 U.S.C. section 371 (conspiracy) do not provide for a private right of action. *See, e.g., Bologna v. Allstate Ins. Co.*, 138 F. Supp. 2d 310, 233 (E.D.N.Y 2001) ("[N]o private right of action exists under . . . 18 U.S.C. [section] 1343."); *Gervais v. Am. Express Centurion Bank*, No. 10CV1712-LAB (AJB), 2010 WL 4929077, at *1 (E.D. Cal. Nov. 30, 2010) ("There is also no private right of action under 18 U.S.C. [section] 371, which is a criminal statute.") (citations omitted). These two claims fail, as they are based on criminal statutes, which do not provide for a private right of action.

Plaintiff's RICO claim, however, is not similarly flawed. The elements of a civil RICO claim are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury to plaintiff's business or property." *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (internal citations and quotations omitted). "Racketeering activity" is any act indictable under one of several federal criminal statutes, including 18 U.S.C. section 1343 (wire fraud). 18 U.S.C. § 1961(1)(B). To establish a pattern, a plaintiff must "show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992) (emphasis in original). "Predicates are related if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated." *Id.* (internal citations and quotations omitted). FED. R. CIV. P. 9(b); *Odom v. Microsoft Corp.*, 486 F.3d 541, 553-54 (9th Cir. 2006). Pleading requirements are to be strictly enforced when default judgment is sought on a RICO claim. *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1393 (9th Cir. 1988). "A wire fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) the use of United States wires or causing a use of the United States wires in furtherance of the scheme; and (3)

specific intent to deceive or defraud." *Odom*, 486 F.3d at 554 (internal quotations and citation omitted).

Here, Plaintiff has satisfied these requirements. He has alleged that the individual defendants and defendant entities, each constituting an "enterprise" under RICO, *see* 18 U.S.C. § 1961(4), used various means of communication, including the internet, which qualifies as United States wires, *see U.S. v. Pirello*, 255 F.3d 728, 729 (9th Cir. 2001), to regularly contact Plaintiff by telephone, through email, and by text messages respecting the purported loan transaction, resulting not in the disbursement of loan proceeds, but, instead, the loss of substantial funds by Plaintiff. (*See, e.g.,* Compl. ¶ 26, 27, 28, 75.) The allegations in the complaint also identify Defendants by name, state the dates on which certain communications occurred, and explain the content of those communications, satisfying the heightened pleading requirements applicable to predicate crimes based on allegations of fraud. (*See, e.g.,* Compl. ¶ 26, 27, 28.) Plaintiff alleges that Walsh emailed Ivan on December 19, 2012, that Walsh copied Plaintiff on that email, and that Walsh gave instructions to "get the agreement to provide up to $500,000 to [Plaintiff]" and "call the consultant immediately to arrange a meeting for [Plaintiff] to pick up funds." (Compl. ¶ 23.) Plaintiff also alleges that Walsh instructed Plaintiff to wire $127,000 to Priscilla and that Walsh indicated they "w[ould] carry out another transfer" of funds." (*Id.* ¶ 48.)

The complaint contains numerous other allegations about communications that were exchanged between Ivan, Walsh, Priscilla, and Plaintiff, all of which concerned the disbursement of loan funds and provided Plaintiff with specific instructions about what funds he was to transmit in order to complete the transaction. (*See, e.g.,* Compl. ¶ 26, 27, 28.) While these communications describe a number of alternative disbursement mechanisms which, in Plaintiff's own words "didn't come to fruition," they do show that Walsh, Ivan, and Priscilla coordinated their communications with Plaintiff to ultimately solicit funds from him without ever intending to disburse the promised business loan. The allegations that these individuals' "focused efforts at camouflaging their whereabouts . . . hiding addresses, using email addresses not connected to businesses, [and] using phone numbers that do not have answering [machines]" establish that the predicate acts are the

means by which Walsh, Ivan, and Priscilla, as well as their respective entities, regularly conduct their business.  (*See* Compl. ¶ 94.)

           *ii.*  *Plaintiff's state law claims*

  While Plaintiff's check fraud claim fails, his claims for conversion and restitution are viable.

  The payee of a check or his assignee may bring an action against a "person who passes a check on insufficient funds . . . ."  CAL. CIV. CODE § 1719(a), (d)-(e).  Such person "shall be liable to the payee . . . ."  *Id.* 1719(a)(2).  Here, Plaintiff references two checks in his complaint.  (*See* Compl. at 8, 14.)  The first is the $1.5 million dollar check made out to Dominican Oil & Gas Exploration LLC.  (*See* Compl. at 8, Ex. I.)  As is evident from the face of the check, Plaintiff is not the named payee.  (*See* Compl., Ex. I.)  The second check referenced in the complaint is the $251,072.12 check deposited into Lindenmeyer's line of credit account.  (Compl. ¶ 67.)  Lindenmeyer is the named payee on that check.  (Pl.'s Br., Ex. A2.)  Plaintiff has made no showing that he is somehow the named payee on either check or that he is the assignee of either Dominican Oil & Gas Exploration LLC or Lindenmeyer.  On these grounds, Plaintiff's check fraud claim fails.[11]

  A plaintiff states a claim for conversion under California law by alleging:  ownership or right to possession of the property, wrongful disposition of that property right, and monetary damages.  *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Service, Inc.*, 958 F.2d 896, 906 (9th Cir. 1992) (applying California law).  "A conversion can occur when a willful failure to return property deprives the owner of possession."  *Fearon v. Dep't of Corrs.*, 162 Cal. App. 3d 1254, 1257 (1984) (citation omitted).  Here, while Plaintiff voluntarily transmitted funds to Walsh and other recipients, he has alleged that he requested the return of those funds and that those funds have not been returned to him.  (Compl. ¶ 103.)  Plaintiff has therefore sufficiently alleged a conversion claim.

---

[11] For the same reason, to the extent that Plaintiff's prayer for relief is based on the check deposited into Lindenmeyer's account, Plaintiff lacks standing to seek such relief.

California law provides that a contract will be implied when one party has something which "in equity and good conscience" it ought not. *Philpott v. Superior Court*, 1 Cal. 2d 512, 522, 36 P.2d 635 (1934); *Nordberg v. Trilegient Corp*, 445 F. Supp. 2d 1082, 1101 (N.D. Cal. 2006) ("[T]he right to restitution or quasi-contractual recovery is based upon unjust enrichment. Where a person obtains a benefit that he or she may not justly retain, the personal is unjustly enriched.") (internal quotations and citations omitted), *abrogated on other grounds as stated in Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 993 (C.D. Cal. 2008). Here, Defendants materially benefitted from Plaintiff's funds at Plaintiff's expense and Defendants continue to retain those funds without conferring any benefit upon Plaintiff or otherwise compensating him. These allegations support a restitution claim based on a theory of unjust enrichment.

### iii.   *Liability of the individual defendants*

Plaintiff seeks to hold the individual defendants personally liable for their actions. The allegations in the complaint establish Walsh's and Priscilla's personal liability and joint liability as to Walsh, Priscilla, and Ivan.

A corporation's veil may be pierced and the corporation may be deemed an alter ego of an individual where (a) there exists a unity of interest and ownership between the personality of the corporation and the individual owner and (b) the failure to disregard their separate identities would yield an inequitable result. *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996) (applying California law). Plaintiff alleges that "Walsh Capital Group is principally the alter ego of Walsh Griffin . . . . Walsh Griffin has sole authority to cause or prevent decisions in and for Walsh Capital Group. . . . Vicken International Traders LLC and KVP International Consultants are principally the alter ego of Priscilla Ellis . . . . . Priscilla has sole authority to cause or prevent decisions in and for these companies . . . ." (Compl. at 22.) This satisfies the first prong of the test for piercing the corporate veil. Moreover, the allegations in the complaint establish that the individual defendants used companies as mere vehicles for soliciting funds from Plaintiff. In fact, the allegations in the complaint show that the only reference Walsh made to his business entity occurred when he blamed his CFO for the recall of the $251,072.12 check. (*See* Compl. ¶ 67.) The only role Priscilla's companies appear to have played in the transaction was providing the

12

corporate accounts into which the funds Plaintiff transmitted were to be deposited.  (*See* Compl. ¶ 49.)  These allegations satisfy the latter requirement for piercing the corporate veil.  Plaintiff has therefore established establish a basis for alter ego liability, justifying recovery against Walsh and Priscilla in their individual capacities.[12]

"The elements of an action for civil conspiracy are (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the common design." *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1062 (2006) (citation omitted).  "In such an action the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity." *Doctors' Co. v. Superior Court*, 49 Cal. 3d 39, 44 (1989) (internal quotations and citations omitted).  The allegations in the complaint are sufficient to establish that Walsh, Priscilla, and Ivan were engaged in a civil conspiracy to defraud Plaintiff.  Plaintiff alleges "that all Defendants thru their communications and actions as described above, formed a conspiracy for the sole purpose of defraud [Plaintiff] . . . and succeeded." (Compl. ¶ 111.)  Specifically, Plaintiff alleges that Walsh, Priscilla, and Ivan sent various messages to Plaintiff, either instructing him to contact one of them, transmit funds to one of them, or follow one of their directives for the purposes of wrongfully soliciting Plaintiff.  (*See* Compl. ¶ 23, 24, 25, 29, 111.)  Plaintiff also alleges that these messages ultimately led him to transmit $176,289.98 to various entities and individuals, without either these amounts having been returned or the original loan amount having been disbursed to Plaintiff.  (*Id.* ¶ 68, 55, 56, 50.)  These allegations establish that Walsh, Priscilla, and Ivan were engaged in a civil conspiracy and consequently, that they are jointly liable for all damages resulting from their scheme to defraud Plaintiff.

---

[12] As Plaintiff has established a basis for alter ego liability, the court does not address Plaintiff's theory that Walsh and Priscilla may be held personally liable for their tortious conduct notwithstanding their status as corporate officers.  With respect to Ivan, the allegations in the complaint indicate that while he was initially acting on behalf of one of his clients, once he referred the transaction to Walsh, he was acting in his individual capacity, not on behalf of any agent or corporate entity.  *See* Compl. ¶¶ 21, 22, 23.

Setting aside the claims based on federal criminal statutes and the defective state law claims, Plaintiff's complaint contains detailed allegations respecting the communications and conduct culminating in the transfer of funds by Plaintiff to the Walsh, Priscilla, Ivan, their respective companies. The second and third *Eitel* factors thus weigh in favor of the entry of a default judgment on Plaintiff's RICO, conversion, and restitution claims.

### 4. The sum of money at stake

Under the fourth *Eitel* factor, the court examines the sum of money at stake. *Eitel*, 782 F.2d at 1471. When the sum of money at stake in the litigation is substantial or unreasonable, default judgment is discouraged. *See id.* at 1472 (district court did not abuse its discretion in denying default judgment where plaintiff sought almost $3 million in damages and parties disputed material facts in the pleadings). Here, Plaintiff seeks to recover $251,072.12 in compensatory damages and $753,216.36 in punitive damages. This is a considerable sum. The fourth *Eitel* factor therefore militates against the entry of a default judgment.

### 5. The possibility of a dispute concerning material facts

The fifth *Eitel* factor requires the court to consider the possibility of a dispute about material facts. *Eitel*, 782 F.2d at 1472. Upon the entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages. *Televideo*, 826 F.2d at 917-18 (citations omitted). Accordingly, the entry of default in this case effectively moots any possible dispute as to material facts. This *Eitel* factor therefore weighs in favor of the entry of a default judgment.

### 6. Whether the default was due to excusable neglect

Under the sixth *Eitel* factor, the court looks at whether the default was due to excusable neglect. *Eitel*, 782 F.2d at 1472. Here, Defendants have never appeared in this case. The possibility that default was due to excusable neglect is remote. *See Shanghai Automation*, 194 F. Supp. 2d at 1005; c*f. Eitel*, 782 F.2d at 1472 (record on appeal supported finding of excusable neglect where parties had been engaged in earnest settlement negotiations after the complaint was served). For this reason, this factor weighs in favor of the entry of a default judgment.

### 7. Preference for deciding cases on the merits

The last *Eitel* factor requires the court to take into account "the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel*, 728 F.2d at 1472. "Cases should be decided upon their merits whenever reasonably possible." *Id.* In the instant action, however, the *Eitel* factors weighing in favor of the entry of default judgment overcome the preference for deciding cases on the merits. On balance, the *Eitel* factors support the entry of default judgment in this case.

## C. Entry of default judgment against less than all defendants

Not all of the remaining defendants are in default. As a result, the entry of default judgment would be appropriate only as to the subset of defendants in default. The defaulting defendants are Walsh Griffin, Walsh Capital Group, Kelvin Don, Priscilla Ellis, KVP International Consultants (also known as KVP International Trades), Vicken International Traders LLC, and Ivan Azziz. (Entry of Default, Dkt. No. 18.)

Federal Rule of Civil Procedure 54(b) provides: "when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all . . . parties only if the court expressly determines that there is no just reason for delay." *See Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 8 (1980).

As discussed above, the factors that favor the entry of default judgment support this court's determination that that there is no just reason for delay in entering that judgment. In addition, after having filed three motions for alternate service, Plaintiff is unlikely to effect service on the remaining defendants by any means. Furthermore, the allegations in the complaint do not establish any liability as against those defendants.[13]

## D. Damages

After entry of default, well-pleaded factual allegations in the complaint are taken as true, except as to the amount of damages. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). To recover damages after securing a default judgment, a plaintiff must prove the relief it

---

[13] Nor do the allegations in the complaint establish any liability as against Kelvin Don, one of the defaulting defendants. *See supra* note 10.

seeks through testimony or written affidavit. *Bd. of Trs. of the Boilermaker Vacation Trust v. Skelly, Inc.*, 389 F. Supp. 2d 1222, 1226 (N.D. Cal. 2005). In the complaint, Plaintiff prayed for $251,072.12 in compensatory damages, $753,216.36 in punitive damages under RICO, interest, costs, reasonable attorney's fees, and any further relief the court may deem appropriate. (*Id.* at 27.) In his motion for default judgment, Plaintiff included a similar prayer for relief, but "waive[d] any award of costs." (Mot. Default J. at 3.)

        1.     Actual loss

The supplemental briefing on the issue of damages, which includes a declaration from Plaintiff submitted under penalty of perjury, reflects the following. Plaintiff, acting on Walsh's instructions, initiated a wire transfer for $127,000 to Vicken International Traders LLC on January 11, 2013. (Pl.'s Br., Exs. D1-D3.) Also acting on Walsh's instructions, Plaintiff transmitted $33,000 to AJR International FZE by wire transfer. (Pl.'s Br., Exs. E1-E3.) At Ivan's request, Plaintiff transmitted $10,000 to the account of Daniel Okwudili, Ivan's attorney, also by wire transfer. (Pl.'s Br., Exs. F1-F3.) On January 14, 2013, Plaintiff initiated two additional wire transfers, one for $3,144.99 to Cisse Abdoulaye, the other for $3,144.99 to Ben Aka.[14] (*Id.*, Exs. G1-G2, H1-H2.) Plaintiff initiated these wire transfers on Walsh's instructions. (*Id.*, Ex. G2.)

Based on the foregoing, Plaintiff is entitled to actual damages in the amount of $143,289.98. This amount excludes the $33,000 wired to AJR International FZE, as Plaintiff has not shown whether the recall he initiated on the transaction was cancelled or fully processed. (*See* Compl. ¶ 27.) This amount also excludes the amount of the original $251,072.12 check deposited into Lindenmeyer's account. Although Plaintiff calculates his damages based on the amount of that check, Plaintiff was neither the payee on the check nor the holder of the account into which the funds were deposited. To the extent that Plaintiff seeks to recover for losses Lindenmeyer suffered as a result of the recalled deposit, Plaintiff lacks standing to assert those claims. For these reasons, damages based on the original check amount are not recoverable here.

---

[14] The $3,144.99 figure differs from the $3,000 figure alleged in the complaint. *See* Compl. ¶¶ 56, 103. The additional $144.99 reflects the fees Plaintiff paid to effect the wire transfers. *See* Pl.'s Br., Exs. G1, H1.

    2.  <u>Treble damages and costs</u>[15]

RICO permits recovery of "threefold the damages [a plaintiff] sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962 . . . ."  18 U.S.C. § 1964(c).  As Plaintiff is entitled to recover $143,289.98 in actual damages, the amount of treble damages recoverable under RICO is $429,869.94.  While RICO also authorizes recovery of costs of suit, Plaintiff "waive[d] any award of costs" in his motion for default judgment.  (Mot. Default J. at 3.)

    3.  <u>Prejudgment interest</u>

"Prejudgment interest is awarded to compensate a party for the loss of the use of his or her property."  *Bullis v. Security Pacific Nat'l Bank*, 21 Cal. 3d 801, 814 n. 16 (1978).  "In an action for breach of an obligation not arising from contract . . . interest may be given in the discretion of the jury."  CAL. CIV. CODE § 3288.  Where, as here, the trial court acts as the trier of fact, the court has discretion to award prejudgment interest under California Civil Code section 3288.  *Bullis*, 21 Cal.3d at 814 n.16 (citations omitted).  In a tort action, interest accrues at a rate of 7% per annum from the time the plaintiff incurs the loss.  *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1585 (1995).

Plaintiff is entitled to recover $143,289.98 in actual damages.  Plaintiff wired $137,000 on January 11, 2013 and $6,289.98 on January 14, 2013 to various defendants.  (Pl.'s Br. at 2.)  Plaintiff is therefore entitled to recover prejudgment interest as of those dates through the date of the entry of judgment at a rate of 7% per annum.  Using these figures, Plaintiff is entitled to $8,020.62 in prejudgment interest as of the date of this order.

---

[15] In his complaint, Plaintiff conflates punitive damages with treble damages recoverable under RICO.  *See* Compl. at 27 ("The aforementioned acts of defendants . . . were consistent with the actions legislated against in the RICO Act, and justify the awarding of treble exemplary and punitive damages . . . .").  The court therefore construes Plaintiff's prayer for punitive damages as one for treble damages under RICO.  In any event, Plaintiff is not entitled to an award of punitive damages, as he has made no showing as to wealth of the various defendants.  *See Prof'l Seminar Consultants, Inc. v. Sino Am. Tech. Exch. Council, Inc.,* 727 F.2d 1470, 1473 (9th Cir. 1984) ("The factors to be considered [when awarding punitive damages] are (1) the nature of the defendants' acts; (2) the amount of compensatory damages awarded; and (3) the wealth of the defendants.") (citation omitted).

## IV.     CONCLUSION

For the reasons set forth above, the court recommends that Plaintiff's motion for default judgment be granted in part and denied in part.  Specifically:

1) Enter judgment by default against Walsh Griffin, Walsh Capital Group, Priscilla Ellis, KVP International Consultants (aka KVP International Trades), and Ivan Azziz jointly and severally.

2) Award Plaintiff a total of $573,159.92 plus interest.

3) Deny the motion as to Salvtore Financial Agency, John Kagose, Kenietta Johnson, Daniel Okwudili, Cissee Abdoulaye, Ben Aka, and Kelvin Don.

Any party may file objections to this Report and Recommendation with the district judge within fourteen days after being served with a copy.  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b); CIVIL L.R. 72-3.  Failure to file an objection may waive the right to review of the issue by the district court.

IT IS SO RECOMMENDED.

DATE: October 30, 2013

_____
KANDIS A. WESTMORE
United States Magistrate Judge